In re Paul V. BOSCIA, Sr., Luann Boscia, Debtors.

Bankruptcy No. 97–09488–6J3.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

July 17, 1998.

---

Stuart S. Ferderer, Orlando, Florida, for debtors.

Laurie K. Weatherford, Winter Park, Florida, Chapter 13 Standing Trustee.

### ORDER GRANTING MOTION FOR TURNOVER AND AWARDING SANCTIONS

KAREN S. JENNEMANN, Bankruptcy Judge.

This case came on for hearing on July 9, 1998, on the Motion for Turnover of Property of the Estate and Imposition of Sanctions and Attorney's Fees (the "Motion") (Doc. No. 12) filed by the debtors, Paul and Luann Boscia (the "Debtors"). The Motion seeks turnover of $2,500 held by respondent, Michael O'Donnell (the "Respondent"), and his sole proprietorship, doing business as Property Investment Company (the "PIC"), pursuant to § 542 of the Bankruptcy Code. The Motion also seeks sanctions and damages for a violation of the automatic stay pursuant to § 362(h) of the Bankruptcy Code. After reviewing the pleadings, considering the evidence and the position of interested parties, the Motion is granted.

The Respondent operates PIC as a service for consumers in financial distress seeking to save their residences

from threatened foreclosure actions. PIC attempts to negotiate reinstatements of delinquent mortgages and to assist the consumers in saving sufficient funds to partially cure outstanding arrears. PIC asserts that it provides no legal or bankruptcy advice or recommendations. At most, PIC is a messenger between the consumer and the applicable mortgage company attempting to negotiate a reinstatement of mortgages which often are substantially delinquent.

Michael O'Donnell individually owns PIC and operates the business as a sole proprietorship. His father, intriguingly, also is identically named Michael O'Donnell. For the purpose of this opinion and to avoid confusion, the senior Mr. O'Donnell will be referenced as the "Father". The Father works at PIC and has direct client contact on the various accounts he handles, yet, allegedly, he receives no monies for his effort.

In this case, the Father was the only person at PIC with whom the Debtors, Paul and Luann Boscia, had any contact. In April, 1997, the Debtors were delinquent on their mortgage payments. A foreclosure action was either filed or imminently threatened. On June 25, 1997, the Debtors first met with the Father in an attempt to avert the foreclosure of their home.

At that initial meeting, the Debtors signed at least three agreements with PIC. Debtors' Exhibit No. 1; Respondent's Exhibit Nos. 1 and 2. The agreements are not entirely consistent. For example, one agreement provides that the total fee to be paid by the Debtors to PIC for its services was $1,275. Debtors' Exhibit No. 1. Another agreement provided that the $1,275 figure was the "minimum fee" for the "initial program". Respondent's Exhibit No. 1. This agreement further provided that "should the client fail to follow the outline of our program by saving the net monies outlined on the consultation record or if the client fails to follow the consultation record and PIC is unable to proceed with

the program, *then additional fees will be due at that time*". Apparently, this second agreement contemplated payment of additional fees if the Debtors failed to save the money requested by PIC or to otherwise comply with PIC's recommendations.

The Debtors paid the $1,275 fee in five payments made as follows: $300 paid on June 25, 1997; $244 paid on July 25, 1997; $244 paid on August 25, 1997; $244 paid on September 25, 1997; and $244 paid on October 25, 1997. The Debtors further saved all of the monies requested by the Father which they believed was necessary to reinstate their mortgage. Specifically, the Debtors saved an amount of $815 per month during July, August and September, 1997. Debtors' Exhibit No. 1. In addition, the Debtors submitted all other budgeting and financial information requested by the Father. Respondent's Exhibit Nos. 7 and 8. The Debtors fully performed all acts required by PIC.

Accordingly, by October, 1997, the Debtors had saved approximately $2,500 which they contemplated would be used to negotiate a reinstatement of their delinquent mortgage. On October 3, 1997, the Debtors obtained a cashier's check in the amount of $2,500 payable to their mortgage company, Norwest Mortgage. Debtors' Exhibit No. 5. The Debtors then delivered the $2,500 check to the Father.

The Father's reaction is significant. He told the Debtors that they needed to obtain a new cashier's check in the amount of $2,500 payable to Michael O'Donnell individually. He explained that he needed a new check in order to place the monies in PIC's trust account so that he could refund the funds to the Debtors in the event he was unable to negotiate a reinstatement with Norwest. The Father did not testify at the hearing on the Motion for Turnover. Accordingly, the only testimony in evidence on this point is the testimony of the Debtors.

The Debtors immediately complied with the Father's request and obtained a substi-

tute cashier's check, this time payable to Michael O'Donnell. The Debtors delivered the reissued $2,500 check to PIC's offices on October 6, 1997. They gave the check to the Father understanding that he would negotiate a reinstatement of their mortgage or return the funds to them.

However, the Debtors' faith was unfounded. PIC provided essentially no services to these Debtors. The Father or other employees of PIC made one or two telephone calls at most on behalf of the Debtors. No evidence was submitted of any additional contact or letters sent by PIC on behalf of the Debtors to Norwest. Rather, the only correspondence introduced in connection with PIC's services was one telecopy, dated October 13, 1997, from counsel for the mortgage company directed to PIC requesting additional financial information from the Debtors. Respondent's Exhibit 3. The Debtors promptly provided the requested information. Respondent's Exhibit No. 8. Essentially, PIC, Mr. O'Donnell and the Father did nothing for these Debtors but make promises and take their money. PIC made no legitimate effort to negotiate a reinstatement of the Debtors' mortgage.

Shortly after providing the additional financial information to Norwest on October 16, 1997, the Debtors received notice of a hearing in the then pending foreclosure action seeking to seize their residence. Alarmed at the imminency of the foreclosure, the Debtors, at long last, consulted with a bankruptcy attorney. The bankruptcy attorney advised that they quickly file a Chapter 13 proceeding in an attempt to save their home. This Chapter 13 case was filed on November 14, 1997.

At that point, the Debtors realized that they had been misserved by PIC and requested a refund of the $2,500 payment. The Debtors did not then and do not now seek repayment of the $1,275 payment they understood to be the fee for PIC's services. Mr. O'Donnell and PIC refused to return the $2,500. On November 28, 1997, Mr. O'Donnell wrote a letter to the Debtors acknowledging he had received the Debtors' request to return the $2,500 but felt "that it is imperative that a meeting be scheduled so that this matter may be addressed and finalized". Respondent's Exhibit 10. Mr. O'Donnell requested that both of the Debtors attend a meeting to discuss the refund and that, in the meantime, he would "audit" the Debtors' file.

At the hearing on July 9, 1998, for the first time, Mr. O'Donnell asserted that the Debtors' total fee due to PIC for its services was the whopping sum of $3,780. The Court cannot help but notice the coincidence between the total amount paid by the Debtors to PIC, $3,775, and the amount now sought by PIC for its services. Again, the Court notes that PIC provided absolutely no beneficial services to the Debtors at any point. However, the Debtors do not challenge the initial payment of $1,275, and the Court will not require its disgorgement. The only issue is whether the Respondents should turnover the $2,500 payment.

█ Section 542(a) of the Bankruptcy Code requires an entity in possession, custody, or control of property that the trustee may use, sell, or lease under § 363 of the Bankruptcy Code to deliver such property to the trustee. 11 U.S.C. § 542(a) (1997). In order to prevail in a turnover action, the movant must show: (1) the property sought to be recovered is property of the estate, and (2) the trustee is entitled to use, sell or lease the property pursuant to § 363 of the Bankruptcy Code. In re Allegheny Label, Inc., 128 B.R. 947, 954 (Bankr.W.D.Pa.1991).

In this case, the Debtors clearly and convincingly have established that the $2,500 payment was to be used only to reinstate their mortgage with Norwest. If the mortgage was not reinstated, the Respondent was to return the funds to the Debtors. The Respondent never gained any type of legal or equitable interest in the funds. At no time did the Debtors consent to PIC's retention of the funds or

contemplate that PIC could retain the funds to pay any additional fees.

Mr. O'Donnell, who had never met the Debtors prior to these Court proceedings, incredibly testified that it would be inconsistent with his company's standard operating procedure to accept a cashier's check made out to him personally if, indeed, the funds were to be used for purposes of reinstating a mortgage. However, in light of his lack of any direct knowledge of the Debtors' conversation with the Father, the Respondent's failure to produce testimony of the Father, and considering the demeanor of the witnesses, the Court does not find Mr. O'Donnell credible.

Moreover, even accepting Mr. O'Donnell's testimony that the $2,500 was intended to pay any additional fees due to PIC, no such fees were due. The Debtors contracted for services from PIC at a flat fee of $1,275. Debtors' Exhibit 1. Additional fees would be due only if the Debtors failed to save the monies necessary for a reinstatement proposal or otherwise failed to comply with PIC's instructions. Respondent's Exhibit 1. In this case, the testimony was unrebutted that the Debtors fully performed all their responsibilities. Accordingly, even pursuant to PIC's own documents, the Debtors owned no additional fees. Respondent's Exhibit 1. The $2,500 constitutes property of these Debtors' estates and should be turned over to the Chapter 13 Trustee for use in this case. Accordingly, the portion of the Motion seeking turnover is granted. The remaining issue is whether sanctions or damages are appropriate.

When PIC continued to refuse to return the $2,500 to the Debtors, the Debtors finally filed the instant Motion for Turnover on January 7, 1998. Mr. O'Donnell was not aware of the bankruptcy proceeding prior to that time; however, he since has steadfastly refused to return property of the Debtors and has continued to exercise control over property of the estate since January 7, 1998. Mr. O'Donnell retained the funds of the Debtors with full knowledge of this bankruptcy and in violation of § 362(a)(3) of the Bankruptcy Code.

Section 362(a)(3) of the Bankruptcy Code provides in relevant part that the filing of a bankruptcy petition operates as a stay of "any act . . . to exercise control over property of the estate." The scope of the automatic stay is broad, *Harsh Investment Corp. v. Bialac (In re Bialac)*, 712 F.2d 426, 431 (9th Cir.1983), and is designed to prevent any kind of creditor coercion or harassment. *In re Grau*, 172 B.R. 686, 690 (Bankr.S.D.Fla. 1994). Any party who intentionally violates the protection of the automatic stay must pay damages. Specifically, subsection (h) of § 362 provides:

(h) Any individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

The moving party is not required to prove that the offending party intended to violate specific provisions of the Bankruptcy Code to constitute a "willful" violation, only that there be deliberate conduct accompanied by knowledge of the bankruptcy filing. *Grau*, 172 B.R. at 689.

In this case, Mr. O'Donnell's actions were knowing and intentional and constitute a violation of the automatic stay. He holds funds in the amount of $2,500 which constitutes property of the Debtors. Section 542 requires that he promptly turnover these funds to the Debtors. He has failed to do so and, in response, raised a totally frivolous claim that the funds were due for some fictitious services performed by PIC.

Mr. O'Donnell's defense is untenable. He simply kept the $2,500 because he did not want to turnover the funds as requested in the Motion. Because this is the first such request for a refund against Mr. O'Donnell, sanctions will not be awarded. If Mr. O'Donnell fails to return similar refunds in future cases, he should

expect substantial sanctions to be assessed. However, the Respondent is liable for all damages incurred by the Debtor as a result of the Respondent's violation of the automatic stay. The only such damages are the attorneys' fees due to counsel for the Debtor in the amount of $1,000 incurred in prosecuting the Motion.

Michael O'Donnell is directed to turnover property of the estate in the amount of $2,500 within ten (10) days of the entry of this Order. Further, the Debtors have incurred damages in the amount of attorneys' fees and costs associated with litigating the Motion. The Court finds that a fee of $1,000 is reasonable for Debtors' counsel's efforts in prosecuting the Motion and awards damages in the amount of $1,000 against Mr. O'Donnell. Accordingly, it is

ORDERED:

1. The Motion is granted.

2. Michael O'Donnell is directed to turnover the amount of $2,500 to the Chapter 13 Trustee within ten (10) days of the entry of this Order.

3. Further, damages for the Debtors' attorney's fees and costs in the amount of $1,000 are assessed against Michael O'Donnell and shall be paid to counsel for the Debtors, Stuart S. Ferderer, Post Office Box 533986, Orlando, Florida 32853–3986 within ten (10) days of the entry of this Order.

4. A separate judgment consistent with this Order shall be entered.

DONE AND ORDERED.